Michelle Lawrence State Representative State Capitol Denver, CO 80203
Dear Representative Lawrence:
This opinion responds to your April 10, 1992 inquiry about the legality of a state agency requiring design professionals to submit cost proposals prior to selection of the most qualified professionals for the job.
QUESTION PRESENTED AND CONCLUSION
Can the Colorado Department of Transportation ("CDOT") require the submission of cost proposals in connection with selecting the "most highly qualified" architects, engineers, or land surveyors for a project?
No.
ANALYSIS
The procurement by state agencies of professional services from architects, engineers, and land surveyors is expressly exempted from the Colorado Procurement Code by § 24-101-105(1), C.R.S. (1988). All such procurements are governed by a separate legislative act set forth at §§ 24-30-1401 to 24-30-1408, C.R.S. (1988 1991 Supp.), more commonly known and referred to herein as "Part 14."
In contrast to the price-based selection methods of the Colorado Procurement Code, the plain language of Part 14 calls for the division of qualifications and price into a two-step process. The three "most highly qualified" professionals are selected under § 24-30-1403(2), C.R.S. (1991 Supp.), and then the public agency attempts to negotiate a scope of work and a fair fee for such services, starting with the most qualified and moving down the line in order of the professionals' respective rankings, until agreement is reached. Section 24-30-1404(1) (2), C.R.S. (1988).
CDOT's procurement of professional services is governed by these statutes. See §§ 24-30-1402(5),(6),(7) 24-30-1403(2), C.R.S. (1988 1991 Supp.). For each proposed project, a CDOT employee budgets an estimated dollar cost specifically for professional services. In soliciting offers, CDOT requires the submission of a cost proposal for the professional services from each offeror. The cost proposal is evaluated and scored on the basis of the degree to which the proposed cost deviates from the CDOT's estimate; cost proposals at or below the estimate receive a higher score for this factor than those proposals above the estimate. This factor accounts for up to 15% of the total evaluation score in the selection phase.
Once the three "most highly qualified" professionals are selected and ranked, CDOT commences contract negotiation with the top ranked professional. A scope of work is decided upon and a fair fee negotiated. According to CDOT, this fee may be higher or lower than the cost proposal, depending upon the final scope of work.
No one disputes the appropriateness of considering a "cost" or "price" factor in the second, or negotiating, stage of the process. The issue is whether, as CDOT claims, "cost" or "price" may also be considered in the first, or selection, phase as well. CDOT premises its position on language in the selection statute which allows consideration of "such factors as . . . willingness to meet . . . budget requirements." Section 24-30-1403(2).
In light of the entire statutory scheme and its legislative history, it appears that CDOT reads too much into this language. The legislative history and the purposes and policies underlying Part 14 make plain that consideration of price at both stages of the process was never the legislature's intent.
The statutory scheme plainly divides selection and price into two distinct steps in the procurement of professional services. The tape-recorded legislative history of House Bill 1432 (1979) confirms that the price of professional services does not become an issue until after selection of the three most highly qualified professionals. Prime sponsor Representative Hilsmeir explained in committee that state agencies having construction projects would "pick the top three that appear to be most qualified. Then they begin to negotiate with this particular professional on all terms of the job, what their fees would be for rendering these professional services." House Business Affairs and Labor Committee, February 22, 1979. During second reading on the House floor, Rep. Hilsmeir further stated that, after selecting the three top professionals, the state agency "would start negotiations with the top qualified consultant on price and scope of work, and this is the major portion of it as contrasted to the state bid." House of Representatives, Second Reading of H.B. 1432, March 23, 1979. Consistent with Rep. Hilsmeir's statements on the House floor, co-sponsor Senator Woodard stated on second reading in the Senate that, "we're talking about a procedure other than a bidding process for the consulting design work." Senate, Second Reading of H.B. 1432, April 24, 1979. These statements make clear that the price of professional services is a matter of negotiation after selection of the most qualified for the job.
Because Part 14 appears largely patterned after the federal "Brooks Act," 40 U.S.C.S. §§ 541 to 544 (1988) and the American Bar Association's Model Procurement Codefor State and Local Governments (1979) (hereinafter "Model Code"), the legislative history underlying those provisions are likewise pertinent in determining the legislative intent behind Part 14. Part 14 became law in 1979, within months following the publication of the Model Code. The Model Code provisions are virtually identical to those of the Brooks Act. Part 14 has the same express policy as the Model Code and the Brooks Act,i.e., to obtain contracts which are the product of both demonstrated competence and a fair fee. See §24-30-1401, C.R.S. (1988); Model Code, § 5-501(2); Brooks Act, 40 U.S.C. § 542.[1] And, like the Model Code and the Brooks Act, as well as similar laws in 37 other states, Part 14 sets out a two-stage (i.e., selection and negotiation) process for procuring the professional services of architects, engineers, and land surveyors. See §§24-30-1403(2), 24-30-1404(1)-(3), C.R.S. (1988 1991 Supp.).
Significantly, the United States Senate Report accompanying adoption of the Brooks Act and the drafters' comments accompanying the Model Code establish that the policy rationale underlying the two-step process is to achieve quality public construction at the lowest possible total cost to the taxpayers. S. Rep. No. 92-1219, 92nd Cong., Second Sess., reprinted in 1972 U.S. Code Cong. Admin. News at 4767 to 4775; Model Code Commentaries at 40-41 (1979). Construction projects are unique procurements because the end result is accomplished through two separate contracts, one for design and the other for actual construction. The bulk of a project's cost is in the construction contract. Id. Public procurement law favors competitive sealed bidding over competitive sealed proposals ("RFPs") whenever possible, meaning that it is preferable to specify exactly the desired result and to solicit price-only competition.See § 24-103-202(1), C.R.S. (1988); seealso § 24-103-203(1), C.R.S. (1988). Obviously, the design must be prepared before sufficient specificity exists to solicit competitive sealed bids for construction. It is equally clear that procurement of professional services necessarily is an RFP-type process, seeking both the design specifications and the price for achieving the result.
The Brooks Act's policy rationale is premised on the fact that professional fees are a very small part of total construction and maintenance costs over the life of a facility, the two-step process is founded upon the notion that the modest savings achievable in price-based professional services competition is heavily outweighed by the greater overall savings to be achieved from letting the professional fully assist public employees in delineating a cost-effective construction project. 1972 U.S. Code Cong. and Admin. News at 4772. The potentially infinite number of possible design or engineering solutions for achieving a desired result places a premium on the creativity of professionals, which is presumably inhibited by consideration of costs prior to negotiation. Competition based in whole or in part upon a preconceived professional price estimate necessarily requires delineation of some methodology and required level of effort for accomplishing the construction result. In such cases the owner has already determined to a large degree what it wants the construction contractor to do rather than allowing the professionals to freely offer creative alternatives. The two-step process of the Brooks Act prefers that public owners select a competent professional first, utilize his or her expertise in formulating alternative concepts for achieving the desired result, and then agree upon a fair fee. Consequently, the Congressional report on the Brooks Act notes, "[u]nder no circumstances should the criteria . . . relating to the ranking of architects and engineers on the basis of their professional qualifications include or relate to the fee to be paid to the firms either directly or indirectly." 1972 U.S. Code Cong. and Admin. News at 4774.
Similarly, the comments to the Model Code explain, "In general, the architect-engineer or land surveyor is engaged to represent the [State's] interest and is, therefore, in a different relationship with the [State] from that normally existing in a buyer-seller situation. For these reasons, the qualifications, competency, and availability of the three most qualified architect-engineer or land surveying firms are considered initially, and price negotiated later."
By adopting the two-step process of the Model Code and Brooks Act, by employing identical policy language in the legislative declaration, and, most significantly, by speaking of separate selection and price negotiation phases in legislative debate, the General Assembly intended that Part 14 be construed with the same approach for public construction in mind. The clear purpose for the two-step RFP process is to remove price competition from the selection phase. By grading a professional lower as to qualifications on the basis of a higher design fee than that estimated by a state employee, CDOT defeats the underlying intent to pay more in professional fees, if necessary, for a better approach to the project.[2]
The phrase "willingness to meet budget requirements" does have a meaning, but it cannot have a meaning which would thwart the overriding legislative intent of Part 14. With this in mind, we conclude that the state, in applying the phrase "willingness to meet budget requirements," must undertake to evaluate the professional's disposition to accept or tolerate the fact that the project is a limited funds public work. Indeed, §24-30-1403(2) requires "discussions" with professionals prior to selecting the three most highly qualified. Those discussions cover "qualifications, approaches to the project, abilities to furnish the required professional services, anticipated design concepts, and use of alternative methods for furnishing the required professional services." It is perfectly sensible to conclude that in such discussions, the state and the professional would discuss the amount appropriated or available for the entire project, and how the professional's various project approaches, anticipated design concepts, and use of alternative methods reflect his or her willingness to deal responsibly with the available project budget.[3]
Based upon this analysis, we conclude that the Department of Transportation procurement process for professional services is inconsistent with statutory directives.
SUMMARY
The General Assembly intended to further the same goals in Part 14 as did Congress and the Model Code drafters. The two-step procurement methodology of Part 14 is founded upon the removal of price competition from the selection of the most highly qualified professional for the job. Price comes into the procurement process only after the three most highly qualified professionals have been selected.
Sincerely,
 GALE A. NORTON Attorney General
ARCHITECTS AND ENGINEERS PURCHASING HIGHWAYS STATUTORY CONSTRUCTION
§ 24-30-1401, C.R.S. (1988) § 24-30-1403(2), C.R.S. (1991 Supp.) § 24-30-1404(1), C.R.S. (1988)
HOUSE OF REPRESENTATIVES
The Colorado Department of Transportation's use of cost as a factor in selecting the most highly qualified architect, engineer, or land surveyor is inconsistent with §§24-30-1403(2) and 24-30-1404(1).
[1] State law has separate purpose and policy statements in Part 14. To the extent CDOT relies on the Part 14purpose of "managerial control" to buttress deference to its administrative construction, 2-4-203(1)(f), C.R.S. (1980), we note that the Department of Administration construes the statute to mean precisely the opposite of CDOT's view. Such nullifying administrative constructions cannot coexist; there is only one legislative intent.
Further, "managerial control" evinces the legislative intent only to give to each agency necessary control over professional selection for its own projects, utilizing a uniform set of statewide principles. See Recording of House of Representatives floor debate on H.B. 1432, March 23, 1979.
[2] As a practical matter, however, CDOT's error may have little, if any, impact when procuring professional services for simple projects like flat straight roadway construction, since there appear to be only a few recognized approaches to constructing a roadway. It would have a greater impact when more variable operations are involved, since, for example, there may be potentially limitless options for constructing complex structures such as bridges and buildings. Although wide-ranging creativity may not always be required and price competition may therefore be more desirable in some cases, the required professional relationship of trust and confidence recognized by all of these statutes is also an issue in every project.See 1978 U.S. Code Cong. and Admin. News at 4772. Balancing these realities is a legislative policy matter.
[3] Although qualitative rather than quantitative selection criteria may appear somewhat antithetical to the policies of fairness and integrity at the root of public procurement, the General Assembly appears to have intended a more qualitative selection process favoring selection of the "most highly qualified" professional.